IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| WEST AMERICAN INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 07-0566-CV-W-ODS |
| RLI INSURANCE COMPANY, et al., | ) ) ) ) | |
| Defendants. | ) | |

<u>ORDER AND OPINION GRANTING AGENCY SERVICES CORPORATION OF
KANSAS, INC.'S AMENDED MOTION FOR SUMMARY JUDGMENT</u>

Pending is Defendant Agency Services Corporation of Kansas, Inc.'s ("ASCK") Amended Motion for Summary Judgment (Doc. # 142). For the following reasons, ASCK's motion is granted.

<u>I. BACKGROUND</u>

This case involves a dispute between a primary and excess insurer of the same named insured. On September 21, 2001, the insured, Stanley Miller, was involved in an automobile accident with Melissa Andrade and Gena O'Dell-Wilson ("the underlying plaintiffs"). On the date of the accident, Miller was insured by Plaintiff West American with a primary automobile liability policy with per person limits of $250,000, and a per occurrence limit of $500,000. Miller also maintained a personal umbrella policy with Defendant and Counter-Plaintiff RLI with limits of $1 million, which provided liability insurance to Miller for any amount for which he was found liable in excess of his policy limits under West American's policy. However, the existence of the RLI policy was not established until several years after the accident.

On October 16, 2001, West American received an offer to settle the Andrade claim for $67,500 and the O'Dell-Wilson claim for $50,000. The settlement offer was to

remain open for 60 days.  West American rejected the offer on October 21, 2001.  On January 10, 2003, the underlying plaintiffs made an offer to settle each claim for $250,000, West American's policy limits.  On April 5, 2004 and August 13, 2004, the underlying plaintiffs again made offers to settle for West American's policy limits.  West American rejected each of these offers.

West American was not made aware of Miller's umbrella policy with RLI until he was deposed during the course of the underlying litigation.  Miller testified that he believed he had an umbrella policy with RLI, but he was unable to find any documentation substantiating his assertion.  On April 22, 2005, West American called RLI to determine whether there was an umbrella policy in effect on the date of the accident.  RLI informed West American that it must contact ASCK, RLI's authorized agent for purposes of receiving notice of claims against RLI's insureds.  West American then placed a call to ASCK and asked whether there was an RLI policy in force.  ASCK told West American that its computer system showed a gap in coverage between 2000 and 2003, so there was no policy in effect on the date of the accident.

In March of 2006, West American and the underlying plaintiffs proceeded to arbitration, which resulted in a damage award in favor of O'Dell-Wilson in the amount of $647,280.01 and a damage award in favor of the Andrades in the amount of $687,312.85.  These awards greatly exceeded West American's $250,000 per person policy limits.  However, West American alleges that the arbitration was conducted pursuant to a binding "high/low" agreement which specified that the "high" was capped at the limits of any applicable policies of insurance.  Accordingly, West American states this agreement protected Miller from any personal exposure.  Judgments were entered confirming the arbitrator's damage award, and West American paid the underlying plaintiffs up to its policy limits.  On May 18, 2006, the underlying plaintiffs filed a garnishment action against Miller, West American, and "Unknown Insurance Companies" seeking to collect the unpaid portions of their judgments against Miller. West American provided Miller a defense in the garnishment action.

In July of 2006, RLI learned of the garnishment proceeding and the underlying claims and judgments against Miller.  At that time, RLI did not know that ASCK had

2

been contacted by West American in April of 2005 regarding the claims against Miller. In October of 2006, RLI intervened as a defendant in the garnishment action. RLI admitted it had an umbrella policy in effect for Miller on the date of the accident, but denied coverage because it did not receive timely notice of the claims against Miller. During discovery in the garnishment action, RLI determined that ASCK did receive notice of the claims against Miller in April of 2005, prior to the judgments being entered against Miller. Accordingly, RLI paid the excess judgments.

In this lawsuit, West American alleges that RLI caused or contributed to cause the filing of the garnishment action against West American and Miller, and also caused or contributed to cause the garnishment action to continue for over a year by not paying the underlying plaintiffs. RLI has counterclaimed against West American for bad faith failure to settle, contending that West American refused to take advantage of opportunities to settle within its primary policy limits. West American has also asserted claims against ASCK, RLI's agent, for contribution and indemnity if West American is adjudged liable to RLI on its bad faith claim. Additionally, West American claims that ASCK was negligent in failing to properly investigate whether there was an RLI umbrella policy in effect and in failing to provide notice to RLI of the claims against Miller. West American also asserts ASCK is liable for negligent misrepresentation for misrepresenting to West American that there was no policy in effect on the date of the accident. ASCK seeks summary judgment on all claims against it.[1]

## II. STANDARD

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See generally Williams v. City of St. Louis, 783 F.2d 114, 115 (8th Cir. 1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and

---

[1] RLI has not asserted any claims against ASCK.

3

which facts are irrelevant that governs." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Get Away Club, Inc. v. Coleman, 969 F.2d 664 (8th Cir. 1992). In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588-89 (1986); Tyler v. Harper, 744 F.2d 653, 655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985). However, a party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of the . . . pleadings, but . . . by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

## III. DISCUSSION

*A. Contribution and Indemnity for RLI's bad faith claim*

The Court is considering certifying a question to the Kansas Supreme Court on the issue of whether West American can be liable to RLI for bad faith failure to settle the claims against Miller within its policy limits even if West American later protected Miller from exposure with a high/low agreement at arbitration. The Court concludes that regardless of how the Kansas Supreme Court resolves that issue, ASCK cannot be liable for contribution or indemnity to West American on RLI's bad faith claim. More specifically, if West American protected Miller's assets by way of a high/low agreement, then any bad faith on the part of West American could only have occurred when it rejected settlement offers within its policy limits in 2001, 2003, and 2004.[2] West

---

[2] Conversely, if West American did not enter into an agreement with the underlying plaintiffs at arbitration that protected Miller from personal exposure, then RLI is subrogated to the rights of Miller to assert his claim for bad faith failure to settle within policy limits. See, e.g., Pacific Employers Ins. v. P.B. Hoidale Co., Inc., 789 F. Supp. 1117, 1121 (D. Kan. 1992). ASCK's failure to provide notice to RLI could not have caused West American to breach its duty to Miller.

As discussed later, the Court concludes West American did not actually rely on RLI's statement, through its agent ASCK, that there was no umbrella policy in effect. However, West American would have been entitled to rely on this representation in

4

American did not contact ASCK until April 22, 2005.  Accordingly, ASCK's failures could not have caused West American's bad faith conduct that occurred before ASCK was contacted.[3]  Therefore, ASCK's Amended Motion for Summary Judgment on West American's claims for contribution and indemnity is granted.

*B. Negligence*

West American has asserted claims against ASCK for negligence in failing to properly investigate whether there was an RLI umbrella policy in effect and in failing to provide notice to RLI of the claims against Miller.  However, "one, even though negligent, is not liable to another to whom he owed no duty." Dye v. Rule, 28 P.2d 758 (Kan. 1934); see also Vanacek v. St. Louis Public Service Co., 358 S.W.2d 808, 810-11 (Mo. 1962) (stating that to be liable for negligence, the defendant must owe a duty to the person injured; "[i]t is not enough to show that the obligation was to another person or class, and that if performed as to them, plaintiff would not have been injured.").  The Court concludes ASCK did not owe a duty to West American.  As the agent of RLI pursuant to an agency agreement, ASCK had a duty to notify RLI of claims on its umbrella policies.  However, West American was not a party to the agency agreement, nor was it an intended beneficiary of the agency agreement.

Additionally, the Court concludes that the type of harm suffered by West American, specifically, expenses West American incurred in litigating the garnishment proceeding, was not a foreseeable result of ASCK's failure to provide RLI notice.  Because injury to West American was not reasonably foreseeable, ASCK cannot be held liable for negligence.  See OMI Holdings, Inc. v. Howell, 918 P.2d 1274, 1295

---

concluding there was no such policy.  Therefore, West American was not required to protect the umbrella policy with the high/low agreement, and West American cannot be liable to RLI for any actions taken in connection with the arbitration.  The Court need not decide whether West American could be liable to RLI if it knew about the umbrella policy and still proceeded with a high/low agreement that exposed it.

[3] Of course, if the Kansas Supreme Court rules that RLI does not have a claim against West American, then ASCK also cannot be liable to West American for contribution or indemnity.

5

(Kan. 1996); Richardson v. QuikTrip Corp., 81 S.W.3d 54, 70 (Mo. App. 2002). Therefore, ASCK's Amended Motion for Summary Judgment on West American's claims of negligence is also granted.[4]

*C. Negligent Misrepresentation*

West American also asserts a claim for negligent misrepresentation against ASCK for its statement to West American that there was no RLI policy in effect on the date of the accident. A plaintiff in a negligent misrepresentation claim must establish that it relied upon the false information. Restatement (Second) Torts § 552; see also Mahler v. Keenan Real Estate, Inc. 876 P.2d 609, 605 (Kan. 1994) (adopting the Restatement (Second) of Torts § 552 as defining negligent misrepresentation in the state of Kansas) and Kesselring v. St. Louis Group, Inc., 74 S.W.3d 809, 813 (Mo. App. 2002). The undisputed facts in this case demonstrate that West American did not rely on the misrepresentation by ASCK.

First, West American could not have relied on the misrepresentation in rejecting four offers to settle within policy limits before the misrepresentation was made. Accordingly, any reliance could only have been in proceeding to arbitration with the alleged high/low agreement that exposed all applicable policies of insurance. West American began considering the possibility of a binding arbitration with a high/low agreement in April of 2004, over a year before the misrepresentation by ASCK. See Doc. # 143, Exh. Q, p. 65. In July of 2004 the parties began negotiating the terms of the high/low agreement. On October 25, 2005, the underlying plaintiffs' counsel proposed that the high of the agreement should be "whatever the available insurance policies are by their terms liable to pay." See Doc. # 143, Exh. CC. On October 27, 2005, West American's counsel, James Godfrey, advised Amy Liebl, West American's claim representative, that counsel for the underlying plaintiffs wanted the high to be all

---

[4] Additionally, as previously discussed, any negligence by ASCK could not have caused West American's prior settlement offer rejections, so ASCK cannot be liable to West American even if West American is found liable to RLI for bad faith failure to settle.

6

applicable policies because he believed there was an umbrella policy in effect. Mr. Godfrey further stated that he saw no problem with that being the high "[a]s long as it is completely understood that we are only responsible up to the amount of our policy." See Doc. # 143, Exh. DD.

Liebl wrote Godfrey on December 21, 2005 with specific instructions as to the terms of the high/low agreement. She stated that West American could not "agree to any binding agreement for any other party then ourselves (i.e.: this supposed umbrella/excess policy that they believe exists)." She then reiterated that she wanted Mr. Godfrey to make it very clear "that we are only agreeing to the limit on our policy number." See Doc. # 143, Exh. Z. Liebl testified in her deposition that she instructed Godfrey that the high should be capped at $250,000 per claimant. See Doc. # 143, Exh. U, pp. 199-224. After the arbitration awards were entered that exceeded West American's policy limits, Liebl contacted Godfrey again to ensure that the high of $250,000 per claimant was in place. She stated "I never got the arbitration agreement sent to me per my requests before signature and agreement, and we need to make sure it is as intended. Regarding maximum payable for all exposures/awards is $250,000 per person. Please send agreement within the next 24 hours for our review." Id. p. 226.

A written agreement was never sent to Liebl because the alleged high/low agreement was never reduced to writing. Nevertheless, Mr. Godfrey responded to Liebl several days later informing her that the agreement did limit the amount of recovery to $250,000 per person. Liebl testified in her deposition that despite this representation by Mr. Godfrey, West American later learned that he had not carried out her directive to limit the high to West American's policy limits. Id. p. 230. Paul Robbins, West American's corporate representative, testified that he didn't know how West American would have acted differently in negotiating the terms of the high/low agreement if it had known there was an RLI umbrella policy in force. See Doc. # 143, Exh. BB, p. 163. Accordingly, the undisputed facts show that West American did not detrimentally rely on ASCK's misrepresentation. The company intended to arbitrate with a high of $250,000 per claimant regardless of ASCK's statement that there was no umbrella policy. The

7

agreement West American intended to enter into was never reduced to writing, and there is a factual dispute as to what agreement, if any, was actually established. In any event, pure speculation is required to determine how the litigation would have proceeded if ASCK had informed West American that an RLI umbrella was in effect and had provided notice to RLI of the claims against Miller. Accordingly, ASCK's Amended Motion for Summary Judgment on West American's claim for negligent misrepresentation is also granted.

## IV. CONCLUSION

For the foregoing reasons, ASCK's Amended Motion for Summary Judgment is granted and ASCK is dismissed from this case.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
DATE: July 1, 2009                          UNITED STATES DISTRICT COURT